**Tagged Opinion**

ORDERED in the Southern District of Florida on  Nov. 18, 2008



John K. Olson, Judge
United States Bankruptcy Court

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

In re:

PATRIOT AVIATION SERVICES, INC.,

Debtor.
_____/

Case No. 07-14995-BKC-JKO

Chapter 11

### ORDER DENYING COMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON OBJECTION TO CLAIM NO. 57 FILED BY MEZZCAP PARTNERS, LLC [DE 332]

THIS CASE presents an interesting issue as to whether a claim for liquidated damages asserted as a general unsecured claim and arising out of an aborted sale of secured debt securities can be subordinated to the claims of general unsecured creditors under Section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b). Because the securities contemplated under the aborted transaction were to have been secured by the Debtor's assets, I conclude that the claim for liquidated damages arising out of the failure of that transaction should be subordinated under § 510(b) only to secured claims against the Debtor, and are thus properly treated as *pari passu* with general unsecured claims. Since the Official

Committee of Unsecured Creditors (the "Committee") Motion for Partial Summary Judgment on Objection to Claim No. 57 (the "Motion") [DE 332] which is before me sought to subordinate the claim of the aborted securities purchaser, MezzCap Partners, LLC ("MezzCap"), to the claims of general unsecured creditors, I will deny the motion and hold that MezzCap's claim, if ultimately allowed, should not be subordinated below a general unsecured claim.

## JURISDICTION AND VENUE

This is an Objection to Claim No. 57 filed by MezzCap, a creditor in this bankruptcy case. I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and § 157(b)(2)(B). Venue in this District is proper pursuant to 28 U.S.C. § 1409.

## FACTS

**1. Procedural history.**

An involuntary Chapter 11 petition [DE 1] was filed against Patriot Aviation Services, Inc. (the "Debtor") on June 27, 2007 and an order for relief was executed on August 2, 2007 [DE 46]. On August 30, 2007, MezzCap filed general unsecured proof of claim No. 57 in the amount of $120,000 (the "Claim"). The Chapter 11 Trustee, Kenneth A Welt, filed an objection [DE 225] to the Claim, to which MezzCap responded [DE 263]. The Committee thereafter filed a joinder to the Trustee's objection to the Claim [DE 331] and the Motion now before me. MezzCap filed a response in opposition to the Motion (the "Response") [DE 369], and the Committee filed its reply (the "Reply") [DE 381]. The parties submitted a joint stipulation of facts ("Stipulation of Facts") [DE 380] and I conducted oral argument on the Motion.

**2. Findings of fact.**

On January 9, 2007, the Debtor and MezzCap duly executed a letter of intent agreement (the "LOI") relating to the proposed purchase by MezzCap from Patriot of certain senior subordinated notes in the aggregate principal amount of $4 million (the "Notes"). Stipulation of Facts *at* ¶ 1. A copy of the LOI, including annexes thereto, is attached as Exhibit "A" to the Response. *See* Stipulation of Facts *at* ¶ 2. Attached to the LOI is the proposed Securities Purchase Agreement (the "Purchase Agreement"). *See* Exhibit "A" attached to the Response *at* Annex B. The LOI provides in relevant part that "upon receipt of the written acceptance of this letter agreement by the [Debtor], the provisions of paragraphs 12 through 13 shall constitute legally valid and binding agreements of the parties hereto." Exhibit "A" attached to the Response *at* ¶ 8. Provision 3 of the LOI provided the conditions to closing, which states in relevant part: ". . .[MezzCap's] consummation of the transaction contemplated by this letter of intent is subject to . . . the negotiation, execution and delivery of definitive documentation, including a securities purchase agreement, containing terms and conditions mutually acceptable to the [Debtor] and [MezzCap]." *See* Exhibit "A" attached to the Response. A definitive agreement, as contemplated in paragraph 3(i) of the LOI, was never executed by and between the Debtor and MezzCap, and any proposed transaction by and between Debtor and MezzCap was never consummated. Stipulation of Facts *at* ¶ 3.

The basis for MezzCap's claim against the Debtor is the $120,000 "Alternative Transaction Fee" provided for in paragraph 4(b) of the LOI. *See* Section 1 in the Claim. MezzCap asserts that it is owed $120,000 in liquidated damages based on the alleged multiple breaches by the Debtor of the LOI as defined in paragraph 4(a) and (b) of the Agreement. Stipulation of Facts *at* ¶ 4. Paragraph 4(a) of the LOI states:

In consideration of the capital and other resources (human or otherwise) committed and to be committed to its due diligence investigation of the [Debtor] and the consummation of the transactions contemplated by this letter of intent, during the Effective Period (as defined in paragraph 9), the [Debtor] will not, nor will it authorize any of its respective affiliates subsidiaries, shareholders, members, managers, directors, officers, employees, attorneys, accountants, investment bankers . . ., business brokers, representatives or agents to, directly or indirectly, initiate or continue contact with, make, solicit, consider, accept, or encourage any inquiries or proposals from, furnish any information regarding the [Debtor] or its business or assets to, or engage or participate in any discussions or negotiations with, any person or entity with respect to any proposal pursuant to which the [Debtor] would (i) obtain any debt or equity capital (other than up to $1.5 million of funded senior indebtedness on terms and conditions and provided by a lender acceptable to [MezzCap]), (ii) be acquired, whether through a purchase, merger, consolidation or other business combination or (iii) sell, lease or otherwise dispose of all or a substantial part of the assets of any of the [Debtor] or its businesses. Any transaction referred to in clauses (i), (ii) or (iii) above is referred to as an "Alterative Transaction". The [Debtor] will promptly communicate to [MezzCap] in writing the fact that the [Debtor] has received any proposal or inquiry regarding any Alternative Transaction.

Exhibit "A" attached to the Response *at* ¶ 4(a). Paragraph 4(b) of the LOI states:

If (i) this letter agreement is terminated by the [Debtor] for any reason (other than as provided in this paragraph 4(b)) and within six (6) months after such termination, or (ii) prior to the termination of this letter agreement, the [Debtor] enters into an agreement or understanding with a third party relating to an Alternative Transaction with such party, then (in lieu of any damages due to [MezzCap] for any breach of this letter agreement by the [Debtor] but in addition to the reimbursement obligation provided in paragraph 7 below) the [Debtor] shall be liable, and shall pay, to [MezzCap] the amount of $120,000 (the "Alternative Transaction Fee"), which Alternative Transaction Fee shall be due and payable to [MezzCap] in cash immediately upon the entering into of such agreement or understanding; provided, however, that the [Debtor] will not be obligated to pay [MezzCap] the Alternative Transaction Fee if [MezzCap] terminates this letter agreement as a result of its decision not to proceed with this transaction based solely upon its due diligence investigation.

Exhibit "A" attached to the Response *at* ¶ 4(b).

The term of the LOI and the means by which it would terminate were as follows:

The term of this letter of intent shall commence on the date [MezzCap] shall have received the written acceptance of this letter of intent from the [Debtor] and shall terminate on the earlier to occur of (i) the Final Closing Date of the transaction contemplated hereby or (ii) the date this letter agreement is terminated pursuant to this paragraph 9 (the "Effective Period"). Either party may terminate this letter agreement without any liability of any kind to the other by giving written notice of termination to the other party at any time after April 30, 2007 (which termination shall be effective as of the date of receipt of such written notice). In addition,

> [MezzCap] shall have the sole right to terminate this letter agreement at any time upon written notice to the [Debtor] (x) if (a) it decides, in its sole discretion, not to proceed with the transactions contemplated herein based upon the results of its due diligence investigation of the [Debtor], or (b) any event or circumstance occurs which, individually or together with any other event or circumstance, has had or would have a material adverse change on any of the [Debtor] or (y) there occurs any other substantial domestic or international calamity or terrorist attack or crisis or change in economic conditions or in the financial markets of the United States which, in the good faith judgment of [MezzCap], is material and makes it impractical or inadvisable to proceed with the transaction contemplated herein. Upon termination of this letter agreement, neither the [Debtor] nor [MezzCap] shall have any liability or further obligation to the other by reason of this letter of intent except pursuant to the obligations under paragraphs 4(b), 6, 7 and 13, which will survive termination.

Exhibit "A" attached to the Response *at* ¶ 9.

MezzCap is an investment capital firm. Exhibit "B" attached to the Response *at* ¶ 4. The structure of the proposed deal provided for debt financing collateralized by the tangible assets in the Debtor. *See* Exhibit "A" attached to the Response *at* Annex A. Under the terms of the Notes the Debtor would, "grant to [MezzCap] a perfected first priority lien upon, and security interest in, its respective assets, including all subsidiary stock; provided, however, to the extent that any such assets are subject to a first priority security interest of a senior lender (the "Senior Lender"), the lien and security interest of [MezzCap] in such assets shall be subordinate and second priority to such Senior Lender's lien an security interest." *Id.* Jeffery D. Kabot, the co-founder and Managing Director of MezzCap, states that the "transaction was intended to be debt financing, not a purchase of equity." Exhibit "B" attached to the Response *at* ¶¶ 3 & 6.

## DISCUSSION

**1. Legal standard for summary judgment.**

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated into bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper if the pleadings, deposition, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material facts that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial. *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593-94 (11th Cir. 1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion and resolve all reasonable doubts in that party's favor. See also *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one

*WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988)(internal citations omitted).  A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325.

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 324.; *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). If the record presents factual issues, the court

must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[1] By its very terms the standard for summary judgment provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.* at 248. As there is no genuine issues of material fact, this matter is ripe for adjudication as a matter of law.

### 2. Subordination of the Claim under 11 U.S.C. § 510(b).

Without conceding that the Claim is valid, the Committee asks me to subordinate it pursuant 11 U.S.C. § 510(b) to the level of equity.[2] Section 510(b) of the Bankruptcy Code provides that:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (2008).

The transaction contemplated in the Purchase Agreement was purely a debt finance arrangement in which the securities to be issued to MezzCap were to be secured by Patriot's assets. It is well established that Florida law, which governs the LOI and Purchase Agreement, provides that courts may

---

[1] Fifth Circuit Decisions entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

[2] The Committee is not conceding the legitimacy of the MezzCap claim, however, for the purposes of the Motion and the relief sought within, the Court must accept the validity of the MezzCap claim.

"consider extrinsic evidence only when confronting an ambiguous contract provision, and courts are barred from using evidence to create an ambiguity to rewrite a contractual provision[.]" *J.C. Penney Co., Inc. v. Koff*, 345 So. 2d 732, 735 (Fla. 4th DCA 1977) (cited with approval in *Uransky v. First Federal Savings & Loan Ass'n of Fort Myers*, 684 F.2d 750, 754 (11th Cir. 1982)). Since the proposed Purchase Agreement and Notes are unambiguous, I am bound under applicable Florida law to conclude that the securities which were to have been issued to MezzCap had the Purchase Agreement been consummated were secured debt instruments, not equity. Nothing in the record before me suggests otherwise.

Part of the theoretical underpinning on which Congress based the policy decision enacted in section 510(b) were the writings of law professors John Slain and Homer Kripke. *See* Slain, John and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U.L. Rev. 261 (1973). The essential elements of Slain's and Kripke's argument were rooted in the concepts of risk allocation to investors and creditors. *See In re PT-1 Communs., Inc.*, 304 B.R. 601, 609 (Bankr. E.D.N.Y. 2004). The underlying concern was that if an investor who contracted to purchase equity in a corporate debtor were able to rescind that agreement in bankruptcy and to assert a general unsecured claim for rescission damages, that investor would receive a windfall by having had (on the one hand) the upside opportunity to realize the benefits of an equity interest in a profitable entity, and (on the other hand) the ability to rescind the transaction in bankruptcy and to share equally with creditors on a rescission claim. Slain, 48 N.Y.U.L. Rev. *at* 286-91. In a report the United States House of Representatives sheds light on the policy rational behind the enactment of the 510(b) provision in the Bankruptcy Code:

> A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated? . . . Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

*See* H Rep. No. 595, 95th Cong., 1st Sess. (1977) at 194 -95. Hence, courts have described the two policy concerns for mandatory subordination under section 510(b) as: (1) the dissimilar risk and return expectations of shareholders and creditors; and (2) the reliance of creditors on the equity cushion provided by shareholder investment. *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 830 (9th Cir. 2001); *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2nd Cir. 2006).

Since the Notes contemplated under the MezzCap transaction had no characteristics of equity instruments, but were instead secured debt financing, do these constitute a "security" as contemplated by section 510(b)? The term "security," as used in § 510(b), is defined by the Bankruptcy Code and includes "notes." *See* 11 U.S.C. § 101(49)(A)(i). The unambiguous language of the statute specifically includes debt securities such as promissory notes. *Banco Espirito Santo Int'l, Ltd. v. Garmendia (In re Bankest Capital Corp.)*, 361 B.R. 263, 267 (Bankr. S.D. Fla. 2006); *see e.g. Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, 1995 U.S. Dist. LEXIS 10175, *24-25, 1995 WL 429494 (S.D.N.Y. July 12, 1995)(finding that promissory notes are within the meaning of Section 510(b), and explicitly rejecting the argument that Section 510(b) should be restricted to equity securities).

When interpreting a statute, a court must begin by examining the language of the statute itself and its analysis ". . . should always turn first to one, cardinal canon before all others. . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there."

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); See also *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241-242 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-103 (1897); *Oneale v. Thornton*, 10 U.S. 53 (1810). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Germain,* 503 U.S. at 254 (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981). However, this will not hold true if the disposition required by the text is "absurd." *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (1942); *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). Thus, the court should, "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson*, 479 U.S. 36, 43 (1986) (internal quotations and citations omitted). When ambiguity exists in the drafting of a specific statute, then the court may look beyond the four corners of that section and rely on legislative history, purpose of the statute, and common usage of terms found in the Code for guidance as to the legislature's intent.

Although Congress primarily focused in § 510(b) on the concern that equity not be able to reap a benefit in bankruptcy by elevating an equity interest through rescission to a general unsecured status, the statute clearly applies more broadly and I therefore conclude that the Notes contemplated in the LOI are "securit[ies]" under the plain language of §§ 510(b) and 101(49)(A).

The question before me is whether a claim for damages based on the Debtor's breach of the LOI, which was entered into in anticipation for the purchase of the Notes, is "a claim . . . for damages arising from the purchase or sale of . . . a security [of the Debtor]" within the meaning of section 510(b).

When analyzing the phrase "arising from" it is not clear under what circumstances this standard is met, thus a statutory ambiguity exists as to the extent and scope of what constitutes "arising" under the purchase of security. *See e.g., Rombro*, 461 F.3d *at* 256. I must therefore look to case law and policy considerations to evaluate the meaning of this provision.

The current case law generally provides a broad interpretation of the "arising from" clause in section 510(b). This broader reading suggests that the purchase or sale of securities must be part of the chain of events, however, the injury may flow from incidents prior to or subsequent to the ratification of such an agreement. *See, In re Nal Financial Group, Inc.*, 237 B.R. 225, 231 (Bankr. S.D.Fla. 1999); *In re Enron Corp.*, 341 B.R. 141, 161 (Bank. S.D.N.Y. 2006). The Third Circuit held in *Baroda Hill Investments, Inc. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), that a claim for damages arising from a breach by the Debtor on a registration agreement of stock is covered by section 510(b) and must be subordinated. 281 F.3d 133, 137 (3d Cir. 2002). The Ninth Circuit stated, "as a textual matter, [we] . . . read 'arising from' as requiring some nexus or causal relationship between the claims and the purchase of the securities," and not limiting this nexus to claims arising out of alleged illegality in the purchase itself. *Id.*, 281 F.3d *at* 138. Similarly, the Ninth Circuit held that section 510(b) covers breach of contract claims. *See Nugent*, 240 F.3d *at* 828-32. Bankruptcy Judge Paul G. Hyman of this District adopted the broad reading of "arising from" and ruled that section 510(b) applied to a claim for breach of a securities purchase agreement requiring issuer to register debentures. *Nal Financial*, 237 B.R. at 231-234. I agree with the reasoning laid out by Judge Hyman and the appellate cases listed above, and therefore read 510(b) broadly to encompass those transactions that have a causal link to the underlying purchase of "securit[ies]."

MezzCap's claim for breach of contract arises under the LOI. The question then becomes whether this variety of claim "arise from" the purchase or sale of a security. MezzCap argues that the LOI was a separate contract giving rise to separate damages, and thus distinct from the Purchase Agreement – *i.e.*, MezzCap's damages flow from the breach of the LOI contract not from the unconsummated Purchase Agreement. MezzCap apparently makes this argument because it fears that characterization of its claims as arising from the purchase or sale of a security necessarily means that its claim would be treated as equity. Section 510(b) does not mandate such a result, and MezzCap's argument is misguided. The LOI was entered into in anticipation of the purchase of the Notes. MezzCap was in full control of whether it entered into the Purchase Agreement after conducting due diligence. Although the Purchase Agreement was never consummated, this fact is irrelevant to the § 510(b) analysis. It is impossible to deny the causal link between the fundamental purpose and intention of the LOI and the end result of the purchasing of the Notes.

There is a nexus between the LOI, the breach of the LOI and the purchase of the Notes (a "security"). Accordingly, mandatory subordination pursuant to 11 U.S.C. § 510(b) is appropriate. The question then becomes: to what level of claim is the MezzCap claim to be subordinated? The plain language of the 510(b) provides that the MezzCap claim is to be subordinated "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." Although the claim was filed by MezzCap as a general unsecured claim, it is actually a claim arising out of an aborted contract to purchase secured debt securities. The status of the MezzCap claim is thus properly subordinated to all secured debt claims against the Debtor, which renders the MezzCap claim (assuming it is ultimately allowed) equal in priority to a general unsecured claim.

This result is consistent with the policy which underlies § 510(b), namely, the prevention of elevation in priority status for claims arising out of the purchase or sale of a security. MezzCap negotiated debt financing in the form of senior subordinated notes, collateralized by security interests in the assets of the Debtor. To permit subordination of MezzCap's claim arising from the Debtor's breach of the LOI would be inconsistent with § 510(b) and would be fundamentally inequitable. MezzCap is not attempting to game the system by jumping to a higher priority. Its claim, if allowed, will be treated as a general unsecured claim.

Based on the discussion above, it is **ORDERED** that:

1. The Committee's Motion [DE 332] is **DENIED**.

2. To the extent that the MezzCap Claim is allowed it will be treated as a general unsecured claim in this bankruptcy estate.

###

Copies furnished to:

Nathan G. Mancuso, Esq.

Grace E Robson, Esq.

Lisa M. Schiller, Esq.

Lawrence A. Gordich, Esq.

Attorney Mancuso is directed to serve a conformed copy of this Order on all other parties in interest and to file a certificate of service.